26CA0969 Peo in Interest of AW 07-30-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 26CA0969
Jefferson County District Court No. 26MH1777
Honorable Jessica Marie Walker, Magistrate

---

The People of the State of Colorado,

Petitioner-Appellee,

In the Interest of A.W.,

Respondent-Appellant.

---

ORDER AFFIRMED

Division III
Opinion by JUDGE KUHN
Freyre and Johnson, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced July 30, 2026

---

Kimberly Sorrells, County Attorney, Sarah Oviatt, Senior Assistant County Attorney, Golden, Colorado, for Petitioner-Appellee

Tezak Law, P.C., Mary Tezak, Florence, Colorado, for Respondent-Appellant

¶ 1    Respondent, A.W., appeals a magistrate's order certifying her for short-term involuntary treatment and authorizing the involuntary administration of antipsychotic, antianxiety, mood stabilizing, and side-effect treatment medications.  She contends that the evidence was insufficient to uphold the order.  Because we disagree, we affirm the order.

## I.    Background

¶ 2    In May 2026, A.W. was admitted to Centennial Peaks Hospital with increasing paranoia and grandiose delusions.  A.W. made statements that "people had been trying to kill her since 1993" and that she is fearful of "the man connected with Epstein."  In the hospital, she presented with hyperverbal speech, concerning behaviors, and paranoia.

¶ 3    The hospital was unable to obtain any previous medical records for her.  However, A.W. reported she had been diagnosed with schizophrenia in the past.  Her treating physician at Centennial Peaks had a working diagnosis of schizoaffective disorder because of her manic presentation.

¶ 4    After unsuccessfully discussing voluntary options for treatment, the hospital requested that A.W. be certified for short-

term mental health treatment under section 27-65-109, C.R.S. 2025, and sought an order authorizing the involuntary administration of six antipsychotic medications, two mood-stabilizers, two antianxiety medications, and two medications to treat side effects.

¶ 5     After A.W. objected, a magistrate held an evidentiary hearing. The magistrate heard testimony from A.W. and from her treating physician, Dr. Roderick O'Brien, who testified as an expert in psychiatry. After the hearing, the magistrate entered an order certifying A.W. for short-term treatment. The magistrate found by clear and convincing evidence that A.W. had a mental health disorder, was gravely disabled, and had refused voluntary treatment. And finding that the People had proved all four elements of the test set forth in *People v. Medina*, 705 P.2d 961, 973 (Colo. 1985), the magistrate also authorized the involuntary administration of four antipsychotic medications, one mood-stabilizer, one antianxiety medication, and two medications to treat side effects. The court also authorized laboratory work to monitor for potential adverse effects from the treatment.

## II.     Analysis

¶ 6     A.W. contends that the district court erred when it (1) found that she was gravely disabled and certified her for short-term treatment and (2) authorized the involuntary administration of medication.  We address each contention in turn.

### A.     Short-Term Certification

¶ 7     A.W. first argues that the evidence was insufficient to support the finding that she was gravely disabled and, therefore, the magistrate erred by certifying her for short-term treatment.  We disagree.

#### 1.     Applicable Law and Standard of Review

¶ 8     A magistrate may certify a person for involuntary short-term treatment if the magistrate finds, by clear and convincing evidence, that the person has a mental health disorder and, as a result, is a danger to herself or others or is gravely disabled. §§ 27-65-109(1)(a), 27-65-113(1), C.R.S. 2025.

¶ 9     As relevant here, a person is "gravely disabled" when she is "incapable of making informed decisions about or providing for [her] essential needs without significant supervision and assistance from other people." § 27-65-102(17), C.R.S. 2025.  As a result of the

inability to make informed decisions, a gravely disabled person is at risk of, among other things, "significant psychiatric deterioration, or mismanagement of the person's essential needs that could result in substantial bodily harm." *Id.*; *see also People v. Taylor*, 618 P.2d 1127, 1134 (Colo. 1980) (interpreting "basic personal needs" to mean "those fundamental necessities of human existence," including "food, shelter, clothing, and medical care").

¶ 10    Whether a person is gravely disabled is a fact-specific determination that depends on the person's condition at the time the finding is made. *People in Interest of Vivekanathan*, 2013 COA 143M, ¶ 14. We review the record as a whole and in light the most favorable to the People to determine whether the evidence is sufficient to support the fact finder's decision. *People in Interest of Ramsey*, 2023 COA 95, ¶ 23. We defer to the court's factual findings if sufficient record evidence supports them. *Id.*

### 2.    Grave Disability

¶ 11    The magistrate found that A.W. was gravely disabled because her mental illness had "impaired her ability to recognize reality" as a result of her "delusions" and "hallucinations." And the magistrate found that her paranoia affected her ability to "receiv[e] enough

4

nutrition for her to be healthy." The magistrate further found that because of her mental illness, A.W. was at risk of substantial bodily harm and worsening physical illness including hypothyroidism for which she required medication. Moreover, the magistrate found that A.W.'s safety was compromised because of her dangerous interactions with her peers. The magistrate also found that voluntary treatment had been discussed and — despite the fact that A.W. voluntarily accepted a "small percentage" of the medications offered to her — "reasonable grounds exist to believe that she will not continue with that voluntary treatment."

¶ 12    In arguing that she is not gravely disabled, A.W. emphasizes that although Dr. O'Brien testified that she was unable to make informed decisions regarding her essential needs, he also testified that she recognized her need for treatment and voluntarily sought help at the hospital. But Dr. O'Brien testified that when he spoke with A.W., he observed that she "does not have an understanding of the diagnosis" and "does not comprehend the consequences of failing to treat the diagnosis." He testified that in addition to getting inadequate sleep, it has been difficult for hospital staff to get A.W. to eat an adequate amount of food or take medication because of

5

her paranoid belief that she is being poisoned. He testified that outside of an inpatient hospital with a locked psychiatric ward, "her safety would be very jeopardized." Illustrating this, he testified that A.W.'s interaction with peers is "generally inappropriate and dangerous" and that her hypersexualized behaviors required the hospital to separate her from other patients to avoid them "taking advantage of her."

¶ 13    With respect to other medical conditions, Dr. O'Brien testified that A.W. had hypothyroidism, which requires medication and, in his opinion, she was unable to consistently take her medication on her own. And he testified that even if A.W. said she would take medication voluntarily, he did not believe she would follow through with doing so.

¶ 14    Throughout her appeal, A.W. argues that Dr. O'Brien's opinions are not based on any past medical history and that he possessed only limited knowledge about her life outside the hospital. Indeed, Dr. O'Brien testified that he had been unable to obtain A.W.'s historical medical records or get collateral information from family and friends. However, he testified from his personal

observation and his review of the hospital's medical records. The magistrate found his testimony credible.

¶ 15 Viewing the record as a whole and in the light most favorable to the People, we conclude that this evidence is sufficient to support the magistrate's finding that A.W. is gravely disabled. *See* § 27-65-102(17); *see also Ramsey*, ¶ 23 ("The resolution of conflicts in testimony and determinations of the credibility of the witnesses are solely within the province of the fact finder."). Thus, we perceive no error in the magistrate certifying A.W. for short-term treatment.

### B. Involuntary Administration of Medication

¶ 16 A.W. also asserts that the magistrate erred when authorizing the involuntary administration of medication. She asserts that none of the four elements required by *Medina* were established by sufficient evidence.

### 1. Applicable Law and Standard of Review

¶ 17 A court may authorize the involuntary administration of medication if the People establish each of the following elements by clear and convincing evidence: (1) the person is incompetent to effectively participate in the treatment decision; (2) the treatment is

7

necessary to prevent a significant and likely long-term deterioration in the person's mental health condition or to prevent the likelihood of the patient causing serious harm to herself or others in the institution; (3) a less intrusive treatment alternative is not available; and (4) the person's need for treatment is sufficiently compelling to override any bona fide and legitimate interest of the person in refusing treatment. *Medina*, 705 P.2d at 973.

¶ 18    We determine whether the evidence, viewed as a whole and in the light most favorable to the People, is sufficient to support the court's order. *People in Interest of R.K.L.*, 2016 COA 84, ¶ 13. The testimony of the physician seeking to administer treatment may be sufficient, without more, to satisfy the *Medina* test. *Id.* at ¶ 30.

¶ 19    Application of the *Medina* test is a mixed question of fact and law. *People v. Marquardt*, 2016 CO 4, ¶ 8. We defer to the court's factual findings if they are supported by the record but review de novo the court's legal conclusions. *Id.* Both the resolution of testimonial conflicts and the determination of witness credibility are solely within the province of the fact finder. *Ramsey*, ¶ 23. Where the evidence supports the court's findings and conclusions, we may

not substitute our judgment for that of the court. *People in Interest of A.J.L.*, 243 P.3d 244, 255 (Colo. 2010).

## 2. The First *Medina* Element

¶ 20    The first *Medina* element requires a court to determine whether the patient is incompetent to effectively participate in the relevant treatment decision. *Medina*, 705 P.2d at 973. A court may not order the forced medication of an involuntarily committed patient unless it is satisfied that the patient's mental illness has so impaired their judgment as to render them incapable of participating in decisions affecting their health. *Id.*

¶ 21    At the hearing, Dr. O'Brien testified that A.W. does not understand her diagnosis or need for treatment. He testified that when he attempted to discuss taking medication voluntarily, "her response is mostly incoherent" and she fixates on tangential issues, including her belief that she is pregnant in spite of a negative pregnancy test performed at the hospital and evaluation by internal medicine doctors.

¶ 22    Nonetheless, A.W. asserts that her own testimony reflects that her judgment is not impaired because she "voluntarily walked into the hospital to seek treatment." In fact, she testified that she went

9

to the hospital because she was "cold" and wanted to check in for "three days voluntarily," not because she recognized her need for treatment.

¶ 23    She also asserts on appeal that she "thoughtfully considered her ongoing treatment options" by contacting a sober recovery house and securing a bed. But it is unclear how an addiction recovery facility would provide adequate treatment to address A.W.'s mental illness given her working diagnosis of schizoaffective disorder.

¶ 24    A.W. appears to disagree with Dr. O'Brien's diagnosis, asserting that she wants to return to her home state of Vermont where her post-traumatic stress disorder, depression, and attention deficient hyper-activity disorder could all be treated with Wellbutrin. And she testified that she was robbed, leading her to experience PTSD symptoms, not that she had the mental health disorders claimed by the doctors. But the magistrate credited Dr. O'Brien's testimony, including his working diagnosis. As noted, the testimony of the physician seeing to administer treatment may be sufficient, without more, to satisfy the *Medina* test. *R.K.L.*, ¶ 30.

¶ 25    Under these circumstances, we cannot conclude that the evidence was insufficient to support the magistrate's determination that A.W. is incompetent to effectively participate in the relevant treatment decision.

### 3.    The Second *Medina* Element

¶ 26    The second *Medina* element may be satisfied by showing either (1) a significant and likely long-term deterioration or (2) the likelihood of serious harm to self or others in the institution. *Medina*, 705 P.2d at 973.

¶ 27    After considering the evidence, the magistrate found that the medications were necessary to prevent a significant and likely long-term deterioration, noting the doctor's testimony that the longer a person is manic or psychotic the "more a deterioration can occur and the harder it is to treat . . . those particular symptoms." And the magistrate noted Dr. O'Brien's testimony that A.W.'s prognosis without any medication was not good, particularly related to her ability to step down to a lower level of care.

¶ 28    A.W. argues that Dr. O'Brien's testimony was not sufficient because he "offered little individualized explanation" regarding her situation specifically. But Dr. O'Brien described the severity of

11

A.W.'s illness and opined that if she does not take the requested medication, there would be a significant and likely long-term deterioration of her mental condition. Moreover, the second *Medina* element does not speak of certainties; it is framed as a likelihood.

¶ 29    In sum, we defer to the magistrate's determination that Dr. O'Brien was a credible and persuasive witness. *See Marquardt,* ¶ 8 (deferring to the magistrate's findings of fact if they are supported by the record). And Dr. O'Brien's expert opinion that, without requested medications, A.W. would likely suffer a significant and long-term deterioration of her mental health condition is sufficient to support the magistrate's conclusion. *R.K.L.,* ¶ 30.

### 4.    The Third *Medina* Element

¶ 30    The third *Medina* element "encompasses not only the gravity of any harmful effects from the proposed treatment but also the existence, feasibility, and efficacy of alternative methods of treating the patient's condition or of alleviating the danger created by that condition." *Medina,* 705 P.2d at 974. A "'less intrusive alternative' constitutes an available treatment that has less harmful side effects and is at least as effective at alleviating a patient's condition as the

proposed treatment." *People in Interest of Strodtman*, 293 P.3d 123, 133 (Colo. App. 2011).

¶ 31 Dr. O'Brien testified about each medication he requested and how they intended to use each one, including alternative medications in case A.W. did not respond to or had allergic or other reactions to the medications. He testified that the requested medications would allow him the flexibility to treat A.W.'s mental illness and any side effects. He further testified that there was no viable, less intrusive alternatives to treatment with medication.

¶ 32 A.W. argues that a less intrusive alternative was to discharge her to the sober living facility and allow her to seek treatment there. But a less intrusive alternative must be "at least as effective at alleviating a patient's condition as the proposed treatment," *id.*, and Dr. O'Brien's testimony made clear that A.W.'s symptoms could not be adequately treated without medication. He testified that the hospital provided group therapy, a recreational therapist, a physical therapist, and other services. Those services "are helpful to augment the pharmacotherapy, but without a full reasonable treatment with medication, [A.W.'s] prognosis is very poor."

¶ 33     Deferring to the magistrate's determinations of the witnesses' credibility and the weight afforded to Dr. O'Brien's testimony, as we must, we conclude that the record contains sufficient support for the finding as to the third *Medina* element.  *See Medina*, 705 P.2d at 974; *A.J.L.*, 243 P.3d at 255.

### 5.     The Fourth *Medina* Element

¶ 34     When analyzing the fourth *Medina* element, a court first determines "whether the patient's refusal [of treatment] is bona fide and legitimate."  *Medina*, 705 P.2d at 974.  If it is, the court then determines "whether the prognosis without treatment is so unfavorable that the patient's personal preference must yield to the legitimate interests of the [S]tate in preserving the life and health of the patient placed in its charge and in protecting the safety of those in the institution."  *Id.*

¶ 35     The magistrate stated that "from what the court can tell," A.W.'s objections to the medication were that the medications will kill her, others are attempting to poison her, the hospital is being bribed by "big pharma," and some other "religious and traditional" reasons.  Nonetheless, the magistrate found that A.W.'s medical

14

condition was "quite grave" and thus overrode any interests she had in refusing the medications.

¶ 36    On appeal, A.W. challenges the magistrate's ruling by listing the potential side effects of the ordered medications and repeating her objections to the use of some of the medications based on previous allergic reactions. She also reiterates her concerns that she might be pregnant.

¶ 37    The magistrate heard both A.W.'s testimony about a potential pregnancy and Dr. O'Brien's testimony that A.W. had undergone testing and the hospital felt "confident within a reasonable degree of medical certainty" that she was not pregnant. After hearing this testimony, the magistrate opted to order involuntary medication, implying that the magistrate found Dr. O'Brien's testimony more persuasive on this point. *See In re Marriage of Udis*, 780 P.2d 499, 504 (Colo. 1989) (noting an appellate court may presume that the district court considered all the evidence presented, even if the order does not expressly recite such evidence).

¶ 38    The magistrate tailored her order such that only necessary antipsychotics would be administered. The magistrate noted A.W.'s testimony that she had had a bad reaction to Haldol at the hospital,

but A.W. also testified that it was somewhat helpful to her mental state. Moreover, Dr. O'Brien testified that he had no evidence that A.W. experienced a bona fide allergic reaction to any medications and explained that her description sounded more like a side effect from the medications.

¶ 39    Viewing this record in the light most favorable to the People, we perceive sufficient clear and convincing evidence of a compelling need for the involuntary administration of medications. *See Ramsey*, ¶ 23. We conclude that the record amply supports the magistrate's findings regarding the fourth *Medina* element.

### III.    Disposition

¶ 40    The order is affirmed.

JUDGE FREYRE and JUDGE JOHNSON concur.